Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CHAD MINNICK, an individual; LINDA STEPHENSON, an individual; STEPHEN REIMERS, an individual; DONALD SCHULTZ, an individual; COREY JELINSKI, an individual; VICTORIA BARTLEY, an individual; CHRISTOPHER CUHEL, an individual; KAREN GREFSRUD, an individual; RITA MCVICKER, an individual; JOSH KELLER, an individual; GLENN REYNOLDS, an individual; EVA GIROD, an individual; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CLEARWIRE US, LLC and DOES 1 through 10,<br><br>Defendants. | NO. C09 0912<br><br>**DECLARATION OF JONATHAN K. TYCKO IN SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE OF AN INDICATIVE RULING ON WHETHER COURT WOULD GRANT LEAVE FOR FILING OF SECOND AMENDED COMPLAINT** |

1. I am an attorney with the law firm of Tycko & Zavareei LLP, and am one of the attorneys representing the plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Motion For Issuance Of An Indicative Ruling (the "Motion").

2. In this declaration, I will describe the evidence that supports the new allegations of Plaintiffs' proposed Second Amended Complaint. That evidence includes the documents attached as Exhibits A, and B to this declaration, and certain facts that I was told

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 1
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

in discussions with a former Clearwire employee. Based upon that evidence, the Second Amended Complaint alleges a scheme of intentional fraud, planned and implemented at the highest levels of Clearwire management. Pursuant to that scheme, Clearwire knowingly enrolled customers that the company knew would not receive adequate, or in some case any, service. Then, when those customers complained, and attempted to cancel their Clearwire service, Clearwire imposed early termination fees ("ETFs") on those same customers.

3. On or about March 3, 2011, our law firm received an envelope, via regular U.S., with no return address on it. Inside the envelope were an email (Exhibit A) and an unsigned, undated explanatory page (Exhibit B). Attached hereto as Exhibit A is a true and correct copy of the email my firm received on March 3, 2011. Attached hereto as Exhibit B is a true and correct copy of the explanatory page that was included in the same envelope that contained Exhibit A.

4. The email is dated May 22, 2008. The email is from Gabe Suarez. According to the explanatory page, Suarez was Clearwire's Director of Engineering, and he reported to Perry Satterlee, the company's Chief Operating Officer.

5. The email lists 20 different cities in which Clearwire operates, and states that "[l]ast night, sector limits were changed" in those markets "to increase the potential PQ opportunities." As explained below, discovery will likely confirm that "PQ" stands for "pre-qualification," and that "increasing the potential PQ opportunities" was a reference to making changes to the settings in software that Clearwire's salespeople use to determine whether potential customers are within Clearwire's service area.

6. The email goes onto state that "[t]his was a topic that was discussed at length and the risks are understood." The email further states: "[w]e do not want to go crazy with these settings but realistically, these were 1 mile increases." And it then instructs the recipients of the email to "monitor these sites closely for capacity and Pullback/Churn

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 2
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

issues." The explanatory page states that "Pullback" is a reference to a customer that "leaves during the first 30 days of service."

7. Standing alone, the email raises serious questions about the propriety of Clearwire's conduct related to new customer acquisition. Its importance to this case and the Court's determination of Plaintiffs' motion in amplified by the information I learned from a person who had contacted me and identified himself as a former high-level employee of Clearwire. That former employee had described to me a scheme by Clearwire to enroll customers who lived outside of Clearwire's actual service area, and to then charge those customers ETFs when they tried to cancel their poor or non-existent service. The email, when coupled with the former employee's explanation, is powerful evidence of that scheme.

8. Our law firm maintains a website. That website contains a "contact" form, that allows visitors to the website to enter a short message, which is then transmitted to us electronically.

9. On November 30, 2010, we received a message that had been sent to us through our website "contact" form by an individual named Donald Hammond. The sender of the message identified himself as a "former member" of Clearwire's "upper management team." The message stated that the sender had "substantial information that will support your case."

10. On December 1, 2010, I called Mr. Hammond, and spoke to him at length. I explained to him that my firm represented the plaintiffs in this case, and that I therefore viewed him as a potential witness. I explained to him that I could not promise to keep my communications with him confidential.

11. Mr. Hammond was a Regional General Manager at Clearwire, responsible for overseeing a large portion of the company's sales activities. He worked at Clearwire for approximately four years, and left the company in early 2010. What follows in this declaration is based upon discussions that I had with Mr. Hammond, both during that initial

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 3
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

1  telephone call on December 1, 2010, and during a subsequent telephone call on December
2  14, 2010.

3      12.    Mr. Hammond stated to me that Clearwire had intentionally sold its service to
4  customers who were not within Clearwire's coverage area. He explained that Clearwire's
5  internet service is a wireless service that is transmitted from towers. He explained that
6  Clearwire's first 48 markets used a technology called Expediance, which provided coverage
7  of between 1 and 1.5 miles from each tower. The coverage range of a particular tower
8  depended on topography, vegetation and other factors impacting the signal. Mr. Hammond
9  explained that, starting in 2008, the company began to roll out a new technology called
10 WiMax, which offered better bandwidth, but which was not much different in terms of
11 coverage area; the WiMax service had a coverage area of between 1 and 1.7 miles from each
12 tower.

13     13.    Mr. Hammond stated to me that Clearwire utilizes a software program that is
14 referred to internally as the "pre-qualification tool," or "pre-qual tool." Before a potential
15 new Clearwire customer can be signed-up for service, the salesperson selling the service
16 must enter the customer's address into the pre-qual tool. The pre-qual tool then determines
17 how far that address is from Clearwire's towers, and whether, at that location, the customer
18 would be able to receive an adequate signal. The pre-qual tool tells the salesperson whether
19 or not the potential customer's address is within Clearwire's service area. A potential
20 customer's address must "pass" the pre-qual tool before a salesperson can enroll that
21 potential customer.

22     14.    Mr. Hammond stated to me that, at one point in time, Clearwire's upper
23 management embarked on what they called "Project Star Trek." Project Star Trek involved
24 manipulating the settings in the pre-qual tool so that potential customers would be "passed"
25 for service—and therefore enrolled by Clearwire's salespeople—even if those customers
26 were outside of Clearwire's actual coverage area.

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 4
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

15. According to Mr. Hammond, this was done by programming the pre-qual tool to pass addresses that were within 2.5 miles of each tower – approximately 1 mile farther away from the tower than had previously been done.

16. A change from 1.5 miles to 2.5 miles in the pre-qual tool would have increased the "qualified" area around each tower by approximately 280%. Using the equation for the area of a circle ($A=\pi r^2$), one can determine that a change in the radius from 1.5 miles to 2.5 miles increases the area of the circle from approximately 7.065 square miles to approximately 19.625 square miles.

17. Mr. Hammond told me that Clearwire's service could not work properly, or at all, at a distance of greater than 1.5 or 1.7 miles from each tower (depending on the type of technology being used in the particular market), and that this was known and understood by Clearwire's management. Thus, when Clearwire's management decided to alter the settings in the pre-qual tool to expand the radius out to 2.5 miles, they did so knowing that this would cause salespeople to falsely inform potential customers that those customers' addresses were within Clearwire's service area, when in fact they were not.

18. Mr. Hammond explained that the changes to the pre-qual tool settings were referred to as Project Star Trek because the company was "going where the company had never gone before" – a reference to the famous opening title sequence used in the original Star Trek television show, in which William Shatner narrates the following: "Space: the final frontier. These are the voyages of the starship *Enterprise*. Its five-year mission: to explore strange new worlds, to seek out new life and new civilizations, to boldly go where no man has gone before."

19. Mr. Hammond explained to me that the purpose of Project Star Trek was to increase the number of the company's "gross subscribers," *i.e.*, the number of new customers enrolling in the service. According to Mr. Hammond, "gross subscriptions" was the primary

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 5
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 652-1415

1  metric that the company focused on at the time because that was the focus of the investment
2  groups that either had invested in, or were considering investing in, the company.

3    20. According to Mr. Hammond, the instruction to change the "pass" settings on
4  the pre-qual tool to 2.5 miles from each tower came from the Chief Operating Officer of the
5  company, Perry Satterlee, and was communicated down to a small group of engineers
6  working for the company, who were responsible for the pre-qual tool. Mr. Hammond also
7  claimed that other top company management were aware of the changes to the pre-qual tool.

8    21. According to Mr. Hammond, Clearwire's salespeople were not told about the
9  changes to the pre-qual tool settings.

10   22. According to Mr. Hammond, when the changes to the pre-qual tool were
11 made, the company experienced a sudden, significant increase in both new customer
12 enrollments, and in "churn." Churn is the industry term used to describe the rate at which
13 existing customers cancel their contracts.

14   23. Mr. Hammond further stated that, after the changes to the pre-qual tool were
15 made, the company also experienced a significant increase in revenue from collection of
16 ETFs, caused by an increase in the number of people enrolling and then cancelling as a result
17 of poor service.

18   24. During my initial discussion with Mr. Hammond, he told me that he had in his
19 possession internal Clearwire emails in which company management discuss ETF-related
20 issues, and that he had at least one email showing the specific instruction to change the
21 setting in the pre qual tool.I asked him if he would be willing to share those emails with me,
22 or provide me with a written statement of his allegations. He indicated to me that he was
23 concerned, for various reasons, about sending me the emails that he had in his possession,
24 and about providing me with a written statement of his allegations.

25   25. Over the next several months, I had a number of shorter telephone
26 conversations with Mr. Hammond, and made inquiries with him as to whether he was willing

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 6
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

1 to share any of the emails he supposedly had in his possession. On a number of occasions, he
2 indicated that he might send me some documents that supported his allegations, but then I
3 would receive no documents from him. Accordingly, although Mr. Hammond was
4 knowledgeable about Clearwire and its internal operations, I had no other source of
5 information or way to corroborate his contentions.

6   26.   That changed on March 3, 2011, when my firm received the email (Exhibit
7 A).

8   27.   That email confirmed many of the details I was told by Mr. Hammond in our
9 telephone conversations. The email discusses "1 mile increases," made "to increase the
10 potential PQ opportunities." That was consistent with what Mr. Hammond had previously
11 told me: that the setting in the pre-qualification tool were changed by approximately 1 mile,
12 so that potential customers would be "passed" by the tool if their addresses were within
13 approximately 2.5 miles of each tower.

14   28.   The email states that "[t]his was a topic that was discussed at length and the
15 risks are understood," and that the changes could cause "Pullback/Churn issues." Those
16 statements are consistent with Mr. Hammond's allegations that Project Star Trek was
17 planned by Clearwire's top management, and that they knew that it would result in enrolling
18 customers who would receive poor or no service.

19   29.   Finally, I would note that Mr. Hammond told me that he believed that
20 Clearwire was engaged in other forms of unlawful conduct, beyond what is described in this
21 declaration. And our discussions included additional details not set forth herein. I have
22 limited this declaration to only the details that I believe are necessary to the Court's
23 consideration of the pending Motion.

24   30.   Attached hereto as Exhibit C, is a true and correct copy of Plaintiffs' Proposed
25 Second Amended Complaint. The new sections and added claims are bolded and underlined
26 for the Court's convenience.

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 7
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415

1  On this 31st day of March, 2011, I declare under penalty of perjury under the laws of the
2  United States of America that the foregoing is true and correct.

/s/ Jonathan K. Tycko
Jonathan K. Tycko

DECLARATION OF JONATHAN K. TYCKO IN
SUPPORT OF PLAINTIFFS' MOTION FOR ISSUANCE
OF AN INDICATIVE RULING - 8
CASE NO. C09 0912

PETERSON YOUNG PUTRA
1501 FOURTH AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-1609
PHONE: (206) 624-6800
FAX: (206) 682-1415